### Benton *v.* McCord.

A mortgagee of chattels, whose mortgage has been duly executed and recorded, though possession remain in the mortgagor, is nevertheless entitled to have preserved in its integrity his lien upon the mortgaged property until such time as he may see proper by foreclosure to enforce the payment of the debt secured; and by virtue of his interest as mortgagee, he may maintain an action on the case as against a third person having notice, actual or constructive, of the mortgage, who wrongfully or fraudulently destroys or impairs his security, and in such action may recover, to the extent that his security has been thus diminished, damages within the value of the mortgaged property and not in excess of the debt secured.

July 8, 1895. By two Justices.

Complaint.  Before Judge Clark.  Rockdale superior court.   October term, 1894.

James Benton sued H. Y. McCord to recover $137.90 as the value of "one bright sorrel horse, hind feet white,

flax mane and tail, five years old." A nonsuit was granted, and the plaintiff excepted. The evidence showed the following facts: On May 22, 1888, N. M. Williams gave to plaintiff a note for $230.04, due November 1, 1888, and to secure the same executed a mortgage on "one separator made by Frick & Company; one chestnut sorrel mare, four years old, name Cora Bell; and one bright sorrel horse, hind feet white, flax mane and tail, five years old; . . also one syrup-mill and evaporator worth about $50." This mortgage was recorded on September 1, 1888, in Jasper county. Upon it were indorsed two credits, one for $16 dated January 18, 1889, the other for $112 dated November 19, 1890. The separator mentioned in the mortgage is in plaintiff's custody, having been delivered to him by Williams, and is not worth over $10. Williams traded off the chestnut sorrel mare, and it is not known where she is. He was in possession of the bright sorrel horse during the years 1888 and 1889, and was using him for general farm purposes. He was last seen in possession of the animal in the spring of 1889. On Saturday, March 28, 1891, R. J. Minter, at plaintiff's request, went in search of the horse in question, and found it in defendant's stables at Conyers. He then went and procured a constable to make a levy on the animal, and in company with that officer went to defendant, and the officer informed him that he had a paper to levy on a horse in his possession. Defendant asked to see the paper, read it and remarked, "That is the horse; that is the right description"; and inquired what Minter was going to do about it. Minter replied, he wanted the horse or the money; and defendant answered, "You will get neither; we will try the rights of property. I will give forthcoming bond." Minter and the constable then returned to Conyers in company with a bondsman sent by defendant; but upon examination the constable found that the mortgage had

not been foreclosed.  As this could not be done in Rock-
dale county, Minter returned to Jasper and reported to
plaintiff, who thereupon caused an affidavit of foreclosure
to be made and an execution to be issued.  On Monday,
March 30, Minter returned to Conyers with the papers,
but did not find the horse.  Defendant said the horse
had left before Minter did on the Saturday before; that
he had run him out of reach of the levying officer; that
if there was nothing else against the horse but plaintiff's.
paper, he would bring the horse up and try the rights
of property, and if said paper took the horse he would
pay plaintiff's claim, but he could not pay this and other
claims that might exist against the horse.  Eugene Ben-·
ton testified, that he was sent with Minter by plaintiff to
have the mortgage foreclosed, and went with Minter to
Conyers in search of the horse.  They could find no
trace of him, and turned their paper over to the sheriff.
On examination they found that the clerk had failed to
attach the mortgage *fi. fa.* to the affidavit of foreclosure.
Witness telegraphed at once for the *fi. fa.* and it came
that afternoon, and he instructed Helms to receive and
turn it over to the sheriff.  On meeting defendant he
said he would produce the horse or give bond for it,
provided there were no other mortgages on record
against it; and asked witness to examine the record and
see if there were anything else against the horse, and
report the same to himself or Davis of Covington.  Both
defendant and Davis remarked that they would write to
persons at Monticello to examine the records for them.
There being no other paper recorded against the horse,
witness relied upon defendant to give bond or turn over
the horse to the sheriff.  The horse was worth $125.  It
further appears, that previously to the transactions re-
lated, Williams, the mortgagor, had sold his effects and
left the State in December, 1890.  To the best of wit-
ness's knowledge he was insolvent.  The sheriff made

search on March 31, for the horse in question, and could not find it. Defendant stated to him that the horse was gone, but did not state where it was gone.

J. N. Glenn and A. M. Helms, for plaintiff.

George W. Gleaton, for defendant.

Atkinson, Justice.

The principles applied by this court in the case of *Harris* v. *Grant* (*ante,* 211), and which are announced and elaborated in the opinion of the Chief Justice, control the questions made in this case, and we are so well satisfied with his reasoning thereon that we do not deem a further elaboration of them necessary.

*Judgment reversed.*